Davis, Appellant, v. Skille and another, Respondents.

*January 11—February 7, 1961.*

For the appellant there were briefs and oral argument by *Ted C. Boyle* and *Richard R. Rynders,* both of Madison.

For the respondents there was a brief by *Aberg, Bell, Blake & Metzner* and *Warren E. Kuehling,* all of Madison, and oral argument by *Mr. Kuehling* and *Mr. Carroll E. Metzner.*

CURRIE, J. While the brief of the plaintiff attempts to raise other issues, we consider that there is but one question which we need decide. Such question is whether the issue of comparative negligence was one which should have been passed on by the jury rather than by the trial court in directing a verdict.

A verdict should only be directed against a plaintiff where plaintiff's evidence, giving it the most-favorable construction it will reasonably bear, is insufficient to sustain a verdict in plaintiff's favor. *Western Casualty & Surety Co. v. Dairyland Mut. Ins. Co.* (1956), 273 Wis. 349, 351, 77 N. W. (2d) 599; *Pelitsie v. National Surety Corp.* (1956), 272 Wis. 423, 427, 76 N. W. (2d) 327; and *Radmann v. Chicago, M. & St. P. R. Co.* (1890), 78 Wis. 22, 26, 47 N. W. 97.

The brief of the defendants sets forth a quotation from our opinion in *Wear v. Northern States Power Co.* (1952), 262 Wis. 9, 13, 53 N. W. (2d) 777, which in turn was copied from the opinion in *Nitka v. Van Camp* (1949), 256 Wis. 119, 121, 40 N. W. (2d) 570. Such quoted extract is as follows:

" '. . . when the trial judge rules, either on motion for nonsuit, motion for a directed verdict, or motion to set aside the verdict, that there is or is not sufficient evidence upon a given question to take the case to the jury, the trial court has such superior advantages for judging of the *weight of the testimony* and its relevancy and effect that this court should not disturb the decision merely because, on a doubtful balancing of probabilities, the mind inclines slightly against the decision, but only when the mind is clearly convinced that the conclusion of the trial judge is wrong.' " (Emphasis supplied.)

Counsel for the defendants seem to interpret the above quotation as holding that, when the trial court has weighed the evidence in passing on a motion for directed verdict, this court should not disturb the trial court's determination in a close case. However, it is hornbook law that the weight to be accorded competent and relevant evidence is for the jury and not the court. *Kanzenbach v. S. C. Johnson & Son, Inc.* (1956), 273 Wis. 621, 624, 79 N. W. (2d) 249. Possibly the reference to *"weight of the testimony,"* which appears in the quoted extract, refers to the exceptional situation where a trial court, in passing on a motion for nonsuit or directed verdict, concludes that there is no credible evidence which would sustain a verdict for the plaintiff and in so doing evaluates and rejects the testimony of a witness on the basis of its being in direct conflict with conceded or physical facts. However, we deem that it is a misnomer to term such determination of incredibility as a weighing of evidence, and to continue to do so is likely to lead to confusion. Therefore, we qualify such quoted language from our opinions in *Wear v. Northern States Power Co., supra,* and *Nitka v. Van Camp, supra,* so as to eliminate therefrom the thought that it is ever the function of a trial court to weigh evidence when passing on a motion for nonsuit or directed verdict.

In the instant case there was no determination that any testimony presented in behalf of the plaintiff was incredible because it was in direct conflict with conceded or physical facts. Because this is so, we need set forth only the testimony and evidence favorable to the plaintiff in order to ascertain whether it would support a jury finding with respect to comparative negligence that would attribute more than 50 per cent of the total aggregate negligence to the defendants.

The accident occurred at about 5 p. m. on December 16, 1957, on a farm located in Dane county. The mechanical device which the plaintiff was operating at the time is referred

to as a "barn cleaner" and was manufactured by the Hedlund Manufacturing Company of Boyceville, Wisconsin.

A description of such barn cleaner is as follows: Two parallel chains are laid at the bottom of the barn gutter which extends through the barn at the rear of the cattle stanchions. Cross cleats, or paddles, are fastened to such chains at intervals of every 24 inches. This device consisting of the two chains and connecting cleats is called the "apron." The cattle are bedded with straw and, when the barn is cleaned, such straw and accumulated manure is pitched into the gutter on top of the apron. At one end of the gutter is a barn door leading to the barnyard. Another part of the barn cleaner consists of a wooden chute some 20 to 24 feet long with one end elevated to a height above the level of the top of a manure spreader. The low end of the chute extends to the barn door. At the upper end of the chute is a revolving roller or drum. After the straw and manure have been placed on the apron, a cable is attached to the end of the apron nearest the chute, which cable is also fastened to a power-driven winch. When the power is turned on, such cable pulls the apron with its load of debris up the chute and under and then over the revolving roller at the upper end of the chute. There is a sufficient opening between the floor of the chute and such roller to cause the debris to drop into a manure spreader which is parked under such opening. After the apron is pulled over such roller the cable causes it to be pulled back toward the barn until the apron finally again comes to rest in the barn gutter.

At one stage of the operation of the barn cleaner one portion of the apron with its load of debris is being drawn up the chute while directly above it another part of the apron is being drawn back toward the barn. When this occurs there is a distance of 18 inches between the top of the side

pieces of the chute and the chains of the portion of the apron which has previously passed under and over the roller and is being drawn toward the barn. It was at this stage of the barn-cleaning operation that the plaintiff was injured.

At the time of the accident the plaintiff was standing just outside the barn-door opening at the foot of the chute. He noticed that at this point some of the debris to be carried up the chute was slipping back and beginning to pile up. He reached in between the near side of the chute and the upper returning apron chain with his gloved right hand and pressed down on such mound of debris. The moving cleats of the apron then caught hold and started to carry such mound of debris up the chute. However, it only proceeded about a foot and a half when it again started to slip back. A second time the plaintiff applied downward pressure to this debris with his right hand. In doing so his weight was shifted to his left foot. This foot slipped and plaintiff involuntarily reached out with his left hand in an effort to grab something that would enable him to regain his balance. As a result his left hand and forearm became entangled in the upper moving apron chain mangling the same to the extent that it was necessary to amputate the left arm at the elbow. There was no ice on the ground where the plaintiff was standing when his left foot slipped, but he testified that he had gotten some manure on his shoes. This was his explanation of why such foot slipped.

The plaintiff further testified that some five or six times in the past when operating the barn cleaner he had observed debris slipping back near the bottom of the chute and piling up. On some of those occasions he remedied the situation by applying pressure with shovel and on others with his gloved hand. The reason given by the plaintiff for not using

the shovel instead of his hand on the day of the accident was because the shovel was then standing against the manure spreader some little distance away.

At the time of the accident the plaintiff was twenty-five years of age and had worked on farms approximately nine years. He had had much experience with power-driven farm machinery but not with a power-operated barn cleaner except for about the month and a half he had been employed on the defendants' farm prior to the accident.

Counsel for the defendants stress the fact that there was a power cutoff located just inside the barn a few feet from where the plaintiff was standing when injured. Metal guides were fastened just inside the barn near the foot of the chute which held the moving apron chains in place. Sometimes such chains slipped out from underneath these guides causing the chains to raise up. If only one chain did this the plaintiff had been instructed by Skille to push it back in place with an iron rod or shovel, but if both chains did so then the plaintiff was to shut off the power before attempting to place the chains back in position. However, if the accident occurred in the manner testified to by the plaintiff, there was no occasion to shut off the power as the chains had not jumped out from underneath the metal guides. The particular condition the plaintiff attempted to remedy could only be alleviated while the apron was in motion so that the pressure applied to the debris would cause the moving cleats to catch hold of it and carry it up the chute.

There was testimony in the record that it was feasible to have constructed a wooden guard which could have been placed above the chute for the partial inclosure of the apron chains when being drawn toward the barn from the roller at the upper end of the chute after the dumping of the carried debris into the manure spreader. Such guard would have

prevented the type of accident which did occur here. The estimated cost of such a guard was that it would not exceed $25. We agree with the opinion expressed by the trial court in its memorandum opinion that this evidence would have supported a finding of causal negligence on the part of the defendants.

We are also of the opinion that the plaintiff was negligent as a matter of law in inserting his right hand and arm between the two sets of moving chains in order to apply pressure to the mound of debris. A shovel was available to him for such purpose, the use of which would not have required that any part of his body come in dangerous proximity to the moving parts of the barn cleaner.

The comparison of negligence is peculiarly within the jury's province. *Jankovich v. Arens* (1952), 262 Wis. 210, 214, 54 N. W. (2d) 909, and *Bailey v. Bach* (1950), 257 Wis. 604, 609, 44 N. W. (2d) 631. While this court has in a number of cases determined as a matter of law that the negligence of a plaintiff equaled or exceeded that of one or more defendants, it has also stated that the instances in which a court can so rule will be extremely rare. *Kraskey v. Johnson* (1954), 266 Wis. 201, 204, 63 N. W. (2d) 112, and *McGuiggan v. Hiller Brothers* (1932), 209 Wis. 402, 407, 245 N. W. 97. In the last-cited case, which was decided soon after Wisconsin's comparative-negligence statute had been enacted, it was stated that the cases, in which a court can rule as a matter of law that the negligence of a plaintiff is equal to or greater than that of the defendant, will ordinarily be limited to cases where the negligence of each is of precisely the same kind and character. Subsequently, this court has realized that in certain fact situations, in which a plaintiff has been disproportionately negligent, justice requires that his negligence be held to equal or exceed that of the defend-

ant even though the negligence of each is not of the same character.[1]

After a careful review of the evidence in this case it is our conclusion that the plaintiff was not so disproportionately negligent as to require that the court remove the comparative-negligence issue from the jury. Therefore, it was error for the trial court to have directed a verdict.

It is to be regretted that the circuit court did not reserve its ruling on the motion for directed verdict until after the jury had returned its special verdict. By so doing, even though the court after the return of the verdict did see fit to have granted the motion, there would now be no necessity of granting a new trial. We do not advocate that such procedure invariably be followed, but in close cases we deem it to be preferable.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

---

[1] Examples of this are afforded by the following cases: *Crawley v. Hill* (1948), 253 Wis. 294, 34 N. W. (2d) 123; *Quady v. Sickl* (1952), 260 Wis. 348, 51 N. W. (2d) 3; *Hephner v. Wolf* (1952), 261 Wis. 191, 52 N. W. (2d) 390; *Klein v. Montgomery Ward & Co.* (1953), 263 Wis. 317, 57 N. W. (2d) 188; *Frei v. Frei* (1953), 263 Wis. 430, 57 N. W. (2d) 731; *Sparish v. Zappa* (1956), 273 Wis. 195, 77 N. W. (2d) 416; *Powless v. Milwaukee County* (1959), 6 Wis. (2d) 78, 94 N. W. (2d) 187; *Kornetzke v. Calumet County* (1959), 8 Wis. (2d) 363, 99 N. W. (2d) 125; and *Bembinster v. Aero Auto Parts,* ante, p. 252, 107 N. W. (2d) 193.